

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2002 APR -2  PM 3: 52

LORETTA G. WHYTE
CLERK

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN THE MATTER OF AMERICAN COMMERCIAL LINES LLC, as Owner of the Barge LCD 4907, and AMERICAN COMMERCIAL BARGE LINE LLC, as Charterer and Operator of the Barge LCD 4907, Praying for Exoneration from and/or Limitation of Liability | CIVIL ACTION<br><br>NO. 00-0252<br>c/w 00-2967<br>c/w 00-3147<br><br>SECTION "N" (5) |

\* \* \* \* \* \* \*

## MOTION IN LIMINE REGARDING TESTIMONY OF GORDON GOLDMAN

Defendants, St. Charles Parish and Orion Refining Corporation[1], bring this Motion in Limine to exclude and/or otherwise limit the testimony of Gordon Goldman at the class certification hearing in this matter. Dr. Goldman opinions are not based on the valid scientific theories and should be excluded. Alternatively, if Dr. Goldman is allowed to testify, his opinions should be limited to those previously provided to defendants and expressed in his deposition.

---

[1]Undersigned counsel has conferred with counsel for Orion who requested that this Motion be submitted on behalf of both defendants.

Fee_____
Process_____
X  Dktd_____
___ CtRmDep_____
___ Doc. No._____

Respectfully submitted:

_____
ALAN A. ZAUNBRECHER (#13783)
BRETT M. BOLLINGER   (#24303)
3850 N. Causeway Boulevard
Lakeway II - Suite 1070
Metairie, Louisiana 70002
(504) 833-7300

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing pleading has been served on all counsel of record by depositing same in the United States Mail, properly addressed and postage prepaid, this _____ day of _____, 2001.

_____
BRETT M. BOLLINGER

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN THE MATTER OF AMERICAN COMMERCIAL LINES LLC, as Owner of the Barge LCD 4907, and AMERICAN COMMERCIAL BARGE LINE LLC, as Charterer and Operator of the Barge LCD 4907, Praying for Exoneration from and/or Limitation of Liability | CIVIL ACTION<br><br>NO. 00-0252<br>c/w 00-2967<br>c/w 00-3147<br><br>SECTION "N" (5) |

\* \* \* \* \* \* \*

## NOTICE OF HEARING

Glenn G. Goodier, Esq.  
201 St. Charles Avenue  
Suite 4800  
New Orleans, LA 70170-5100

Sidney J. Hardy, Esq.  
3445 N. Causeway Boulevard  
Suite 800  
Metairie, LA 70002

Randal L. Gaines, Esq.  
311 Devon  
LaPlace, LA 70068

Walter Willard, Esq.  
Deer Park, Suite 3A  
10555 Lake Forest Boulevard  
New Orleans, LA 70127

PLEASE TAKE NOTICE that the foregoing Motion in Limine Regarding Testimony of Dr.

Gordon Goldman filed by defendant, St. Charles Parish, will be brought on for hearing in the United

States District Courthouse, 500 Camp Street, New Orleans, Louisiana, on the 17th day of April,

2002, beginning at 9:30 a.m., or as soon thereafter as counsel may be heard.

Respectfully submitted:

ALAN A. ZAUNBRECHER (#13783)  
BRETT M. BOLLINGER   (#24303)  
3850 N. Causeway Boulevard  
Lakeway II - Suite 1070  
Metairie, Louisiana 70002  
(504) 833-7300

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN THE MATTER OF AMERICAN COMMERCIAL LINES LLC, as Owner of the Barge LCD 4907, and AMERICAN COMMERCIAL BARGE LINE LLC, as Charterer and Operator of the Barge LCD 4907, Praying for Exoneration from and/or Limitation of Liability | CIVIL ACTION  NO. 00-0252  c/w 00-2967  c/w 00-3147  SECTION "N" (5) |

* * * * * * *

## MEMORANDUM IN SUPPORT OF MOTION IN LIMINE REGARDING TESTIMONY OF GORDON GOLDMAN

MAY IT PLEASE THE COURT:

A class certification hearing in this matter is scheduled for April 24, 2002. In preparation for this class certification hearing, defendants have propounded discovery and taken numerous depositions to ascertain the evidence and witnesses to be presented by plaintiffs and to properly prepare the defense in this matter. As detailed below, the deposition of Gordon Goldman was taken on December 14, 2001. Dr. Goldman's opinions regarding causation in this matter will not assist the Trier of Fact and are not based on valid, testable scientific methods, and, therefore, do not meet the requirements of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, *509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed. 2d 469 (1993)*. Alternatively, if Dr. Goldman is allowed to testify, his testimony should be restricted to those opinions previously provided to defendants and discussed in his deposition.

### Dr. Goldman's Testimony Should be Excluded Under Rule 702 and *Daubert*

Federal Rule of Evidence 702 provides:

If scientific, technical, or other specialized knowledge will assist the Trier of Fact to understand the evidence or to determine a fact in issue, a witness qualified as an

expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

The proponent of expert testimony bears the burden of establishing, by a preponderence of the evidence, that the testimony will be reliable. *Tanner v. Westbrook*, 174 F.3d 542 (5th Cir. 1999). When deciding whether to allow expert testimony, the trial judge must determine whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology properly can be applied to the facts in issue. *Daubert*, 509 U.S. 593; *Tanner*, 174 F.3d 542; *Skidmore v. Precision Printing and Packaging, Inc.*, 188 F.3d 606 (5th Cir. 1999). Factors to be considered in making this determination include whether the theory or technique can or has been tested; whether the theory or technique has been subjected to peer review and publication; the known or potential error rate; and whether the theory or technique is generally accepted in the scientific community. *Id*.

The testimony of Dr. Goldman is simply based on unsupported speculation rather than valid scientific theories or techniques. The lawsuit in question involves a claim by several residents of St. Charles Parish that they became ill after drinking water that contained a small amount of diesel fuel. Dr. Goldman was retained by plaintiff's counsel to provide an opinion regarding the potential for injury from exposure to contaminated drinking water. Dr. Goldman testified in his deposition that the contamination in the water would need to be above a certain threshold level in order to cause any of the symptoms. However, Dr. Goldman admitted that he did not know this threshold level of contamination. Dr. Goldman repeatedly stated that he could not provide any specific information on acceptable or unacceptable levels. Dr. Goldman admitted that there was a threshold level, below which he would not expect any health problems. He additionally stated that there are numerous

articles or studies detailing this threshold level and the health hazards associated with diesel contamination. However, Dr. Goldman was unable to provide any support for his opinion in studies, tests, or any other materials. He simply stated that he would provide these materials to plaintiff's counsel. Defendants have never received these materials.  Specifically, Dr. Goldman was questioned as follows:

Q.    Since this case is about the presence of diesel in drinking water, what is your expert opinion as to the threshold level, in terms of parts per million, above which the diesel level in water would be harmful to human beings?

A.    I do not know that.

Q.    You do not know what it would be?

A.    In the concentration in water, I do not know.

(Exhibit A, deposition of Dr. Goldman p. 53 lns 14 - 23).

Q.    . . .You do not know what the minimum level of concentration of diesel in water would need to be in order to cause health problems?

A.    I do not know.  I also do not know what is the EPA level, the acceptable.

Q.    You seem to be confident with that 5000 parts per million in your opinion would cause health problems?

A.    Yes

Q.    Can you direct me to any literature to support that?

A.     I would have to check on specific articles and I will be happy to pass that on to Mr. Gaines and he can pass that on to you.

(Exhibit A, deposition of Dr. Goldman p. 105 ln 25 - p. 106 ln 15).

Q.    Did you refer to any materials or can you direct me to any materials that can provide me with a minimum concentration level or diesel that is harmful or can cause health effects from ingestion?

A.      I can and I will be happy to give it to Mr. Gaines and he can pass it on to you. (Exhibit A, deposition of Dr. Goldman p. 108 ln 19 - p. 109 ln 1).

Dr. Goldman's opinion is, essentially, that people can get sick from ingesting, inhaling, or otherwise coming in contact with diesel. However, he has provided no support other than to say that he could provide reference materials. These materials have never been provided despite discovery requests directed at this issue. Further, Dr. Goldman does not know the threshold level of contamination necessary to cause harm. Without knowing the threshold level of contamination, Dr. Goldman's opinion is essentially useless. Defendants will not dispute, for purposes of this argument, that diesel, as well as numerous other chemicals, can cause nausea and other symptoms at high enough concentration levels. Dr. Goldman testified that he does not know what concentration level is sufficient to cause any of the symptoms. Additionally, he testifies that he does not know if the water in the St. Charles Parish water distribution system contained a high enough concentration to cause any of the symptoms. This testimony of Dr. Goldman does not even pass the Rule 702's threshold requirement of assisting the Trier of Fact in understanding the evidence. If defendants will not dispute that diesel may cause nausea and other symptoms at some level of concentration and Dr. Goldman's testimony is that diesel will cause nausea and other symptoms at some level of concentration then his testimony does not assist the Trier of Fact and should be excluded under Rule 702.

Furthermore, if the Court were to allow Dr. Goldman's testimony, the Court must consider the validity or testability of his theories. In his deposition, Dr. Goldman was asked about the levels of diesel contamination as detailed above. Dr. Goldman admits that there are tests and reference

materials that discuss the minimum level of diesel contamination necessary to cause harm. However, he cannot provide these levels or any reference materials discussing these levels. Additionally, he has not conducted any tests to determine these levels for himself. Dr. Goldman's opinions simply have no reliable basis. It does not meet any of the *Daubert* standards. It cannot be tested, it has not been subjected to peer review, he provides no error rate, and his opinion is not generally accepted. Dr. Goldman actually admits that his opinions do not meet the *Daubert* standards by saying that there are reference materials and tests to determine the necessary threshold level of diesel contamination, but that he has not conducted any tests or provided any of these materials. This testimony of Dr. Goldman, therefore, also fails under the *Daubert* standards.

### If Allowed to Testify, Dr. Goldman's Testimony Must Be Limited

Federal courts have inherent powers necessary to achieve the orderly and expeditious disposition of their dockets. *Natural Gas Pipeline Co. v. Energy Gathering, Inc.*, 86 F.3d 464 (5th Cir. 1996). In preparation for the class certification hearing in this matter, on July 17, 2001, defendants propounded Interrogatories and Request for Production of Documents specifically directed at the class certification issues in this case. On August 10, 2001, plaintiffs provided answers to these discovery requests. The answers provided by plaintiffs were used as a basis for preparing the defense to plaintiffs' proposed class certification. These responses were also used to conduct further discovery to fully explore plaintiffs' case. With regard to expert witnesses, the discovery asked for the name, address, and field of expertise for each expert plaintiffs intend to call at the class certification hearing. The discovery additionally asked for a summary of the experts' opinions, copies of expert reports, and a list of every case in which the expert has testified. With regard to the request for a summary of the experts' opinions, plaintiff responded, "All witnesses are available for

deposition. Any reports will be made available as provided to petitioner." Based on this response, defendants deposed all of plaintiffs' listed experts, including Dr. Goldman. The deposition of Dr. Goldman was taken on December 14, 2001. Defendants deposed Dr. Goldman for several hours and requested all of his opinions with regard to this case. Dr. Goldman testified that, in his opinion, diesel contamination could cause the types of injuries described by the plaintiffs. However, he could not provide any specific details about the threshold amount of contamination necessary to cause harm or whether there was sufficient contamination in the St. Charles Parish water system to cause harm.

Since the time of Dr. Goldman's deposition, defendants have been provided with no new materials regarding his opinion in this matter. Any change in his opinion would require a supplementation of plaintiffs' discovery responses. Defendants have received no such supplementation and, therefore, assume that there has been no change in his opinion. Out of an abundance of caution, defendants request that, if Dr. Goldman is allowed to testify, his opinions be restricted to those opinions provided in his December 14, 2001, deposition.

**Conclusion**

The opinions expressed by Dr. Goldman will not assist the Trier of Fact in this matter. Additionally, his opinions fail to meet the standards set forth in *Daubert*, and therefore, should be excluded under Rule 702. Accordingly, defendants request that the testimony of Dr. Goldman be excluded from the class certification hearing. Alternatively, if the Court allows Dr. Goldman to testify, defendants request that his testimony be limited to the opinions he provided at his deposition in this matter.

Respectfully submitted:

_____

ALAN A. ZAUNBRECHER (#13783)
BRETT M. BOLLINGER   (#24303)
3850 N. Causeway Boulevard
Lakeway II - Suite 1070
Metairie, Louisiana 70002
(504) 833-7300

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing pleading has been served on all counsel of record by depositing same in the United States Mail, properly addressed and postage prepaid, this 2 day of _April_, 2002.

_____

BRETT M. BOLLINGER

**Page 1**

```
 1        UNITED STATES DISTRICT COURT
 2        EASTERN DISTRICT OF LOUISIANA
 3
 4  IN THE MATTER OF AMERICAN     CIVIL ACTION
    LINES, L.L.C. as OWNER of the  NO: 00-0252
 5  Barge LCD 4907, and AMERICAN  c/w 00-2967
    COMMERCIAL BARGE LINE L.L.C., c/w 00-3147
 6  as Charterer and Operator of
    the Barge LCD 4907, Praying for
 7  Exoneration from and/or        SECTION "B"
    Limitation of Liability        (5)
 8
 9          Deposition of DR. GORDON
    GOLDMAN, 4804 AVRON BOULEVARD, METAIRIE,
10  LOUISIANA 70006, taken in the offices of MR.
    SIDNEY J. HARDY, 3445 Causeway Boulevard,
11  Suite 800, Metairie, Louisiana, on Friday,
    December 14, 2001.
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```



**Page 3**

```
 1  CAMPBELL, McCRANIE, SISTRUNK,
 2  ANZELMO & HARDY
    ATTORNEYS AT LAW
 3  BY:  MR. SIDNEY J. HARDY, ESQUIRE
         MR. RICHARD A. HOUSTON, ESQUIRE
 4  3445 NORTH CAUSEWAY BOULEVARD
    SUITE 800
 5  METAIRIE, LOUISIANA 70002
    (ATTORNEYS FOR ORION REFINING
 6      CORPORATION)
 7
 8
 9
10
11
12
13
14
15
16
17  REPORTED BY:
18      JUDY L. BUCKMAN, CCR
        CERTIFIED COURT REPORTER
19
20
21
22
23
24
25
```

**Page 2**

```
 1  APPEARANCES:
 2
 3  LAW OFFICES OF RANDAL L. GAINES
    ATTORNEYS AT LAW
 4  BY:  RANDAL L. GAINES, ESQUIRE
    311 DEVON
 5  LAPLACE, LOUISIANA 70068
    (ATTORNEYS FOR PLAINTIFFS)
 6
 7
 8  LAW OFFICES OF WALTER L. WILLARD
    ATTORNEYS AT LAW
 9  BY:  WALTER L. WILLARD, ESQUIRE
    10555 LAKE FOREST BOULEVARD, SUITE 3E
10  NEW ORLEANS, LOUISIANA 70127
    (ATTORNEYS FOR PLAINTIFFS)
11
12
13  LAW OFFICES OF ALAN ZAUNBRECHER
    ATTORNEYS AT LAW
14  BY:  BRETT BOLLINGER, ESQUIRE
    3850 NORTH CAUSEWAY BOULEVARD
15  SUITE 1070
    METAIRIE, LOUISIANA 70002
16      (ATTORNEYS FOR ST. CHARLES PARISH)
17
18
19  JONES, WALKER, WAECHTER, POITEVENT,
    CARRERE & DENEGRE
20  ATTORNEYS AT LAW
    BY:  GLENN G. GOODIER, ESQUIRE
21  201 ST. CHARLES AVENUE
    NEW ORLEANS, LOUISIANA 70170
22      (ATTORNEYS FOR DEFENDANTS)
23
24
25
```

**Page 4**

```
 1           I N D E X
 2                      PAGE
 3  SUIT CAPTION           1
 4
 5  APPEARANCES           2, 3
 6
 7  STIPULATION             5
 8
 9  REPORTER'S CERTIFICATE   151
10
11
12       E X A M I N A T I O N
13
14  MR. HARDY, ESQUIRE     6, 83
15
16  MR. GOODIER, ESQUIRE    80
17
18  MR. BOLLINGER, ESQUIRE   94
19
20       E X H I B I T S
21
22  EXHIBIT NO. 1 (CV)         8
23  EXHIBIT NO. 2 (CHEMICAL GUIDE)  38
24  EXHIBIT NO. 3 (REPORT SUMMARY)  47
25
```

55

1  Distribution is relative to the people who
2  filed the complaint.
3      Q.   Do you have an opinion whether
1  the presence, whether diesel was present in
5  the water system at a higher level than that
6  reflected in those two lab reports at some
7  time after the spill?
8      A.   I have never seen any analysis, so
9  I can't give you an answer on that.  I can
10  only judge it based on a qualitative
11  opinion, based on the complaints and reports
12  of the people who complained that they had
13  effects from it.
14      Q.   Since this case is about the
15  presence of diesel in drinking water, what
16  is your expert opinion as to the threshold
17  level, in terms of parts per million, above
18  which the diesel level in water would be
19  harmful to human beings?
20      A.   I do not know that.
21      Q.   You don't know what it would be?
22      A.   In the concentration in water, I
23  do not know.
24      Q.   Do you know if the EPA or any
25  state, local or federal entity set such

1  according to this book, it is unavailable.
2      Q.   To clear this up before I move --
3      A.   I cannot answer that.
4      MR. GOODIER:
5          By this book, you mean the 1976
6  book from the Coast Guard?
7      THE WITNESS:
8          That's correct.
9  EXAMINATION BY MR. HARDY:
10     Q.   To clear this up for the record,
11  so we can move on.
12         You are unaware of any acceptable
13  minimal level of concentration of diesel in
14  drinking water?
15     A.   I am not aware of what is the
16  minimum amount acceptable of diesel.
17     Q.   Let me ask you about your terms of
18  compensation in connection with this case.
19         Under what arrangements are you
20  working in terms of your compensation in
21  this case?  Is it hourly?  Is it a flat
22  rate?
23     A.   I was given a retainer.
24  Basically, for that retainer I have been
25  preparing for this deposition and so forth,

54

1  guidelines, threshold levels?
2      A.   I would think that they probably
3  do, but I don't know exactly what it is.
4          Now, you are asking what is the
5  threshold or minimum exposure level for a
6  person who would be exposed to it, what
7  would be the minimum amount of diesel in
8  water if he was going to drink that water?
9      Q.   My question is do you know the
10  threshold levels set by the EPA or by any
11  state of local entity regarding the safety
12  of drinking water in regard to the amount of
13  diesel in it?
14         What are the acceptable levels?
15  What is an unacceptable level?
16     A.   I do not know.
17     Q.   Do you have any idea as to a
18  threshold, for example, are we talking about
19  a 100 parts per million?  Are we taking
20  about 500 parts per million?
21         Is it just one part per million?
22  Do you have any idea?
23     A.   In water, I do not know.  Let me
24  check.  I don't believe.  In diesel,
25  specifically, I'm sorry, I cannot --

56

1  doing a report and looking up as much
2  information as I could possibly get.
3      Q.   How much were you given?
4      A.   I was given $1000.
5      Q.   That is all that you have been
6  paid thus far?
7      A.   Well, I was paid by Mr. Gaines
8  $1000 and then he gave me an additional
9  amount of $600 to prepare for this
10  deposition.
11     Q.   You understand that you will be
12  paid for your services in the future as
13  those services are rendered?
14     A.   I suspect that I would.  We will
15  have to negotiate.
16     Q.   Going on to your report.  It's not
17  very long, so hopefully this won't take very
18  long.
19         Going to the second paragraph of
20  your report, it says that the accident
21  occurred on July 28, 1999, when a barge
22  located at the Orion Refinery accidently
23  released diesel fuel into the Mississippi
24  River at the barge dock.
25         Now, from whom did you receive

105

1    MR. GAINES:
2        Objection. That has been asked
3    and answered.
1    MR. BOLLINGER:
5        And he answered that it was 5000
6    parts per million and he has now changed
7    that opinion.
8    MR. WILLARD:
9        Mr. Hardy's testimony was that it
10   was 5000.
11   THE WITNESS:
12       I said one part.
13   MR. GOODIER:
14       I think the simple answer is he
15   has no clue. He does not know. Is that
16   correct, Doctor?
17   THE WITNESS:
18       I am saying that at 5000 parts per
19   million or a 1/2 percent, I believe that you
20   would have a problem. And at 1000 parts per
21   million you would have a discomfort.
22       What the minimum amount is, I do
23   not know.
24   EXAMINATION BY MR. BOLLINGER:
25   Q.   I think that's fair. You do not

106

1    know what the minimum level of concentration
2    of diesel in water would need to be in order
3    to cause health problems?
4    A.   I do not know. I also do not know
5    what is the EPA level, the acceptable.
6    Q.   You seem to be confident with that
7    5000 parts per million in your opinion would
8    cause a health problem?
9    A.   Yes.
10   Q.   Can you direct me to any
11   literature to support that?
12   A.   I would have to check on specific
13   articles and I will be happy to pass that on
14   to Mr. Gaines and he can pass that on to
15   you.
16   Q.   Okay. In preparing your expert
17   opinion in this case did you investigate
18   what levels of diesel fuel concentrations
19   would cause harm?
20   A.   When I prepared, I used just the
21   information that was given to me, based on
22   the complaints of the various plaintiffs and
23   the report of the St. Charles Parish Water
24   Works, where it says 52 parts per million
25   and the general information given to me.

107

1        I did not -- I did look up in
2    certain books, but I do not have the
3    information with me. I have to get it for
4    him to get the exact number, what is the
5    tolerance, what is the exposure level.
6    Q.   I want to clarify because we have
7    referred a couple of times to this 52 parts
8    per million.
9        You are referring to the
10   Environmental Analytical Solutions report;
11   correct? We had discussed it earlier in the
12   deposition.
13   A.   Yes.
14   Q.   This report, the second to last
15   line shows a TPH. Do you have that handy?
16   A.   Yes.
17   Q.   It shows a TPH which is a total
18   petroleum hydrocarbon, is that your
19   understanding of TPH?
20   A.   Yes.
21   Q.   Of a 51.6 milligrams per liter
22   which equals two parts per million; correct?
23   A.   It's 51.6 parts per million.
24   Q.   We've referred to it as 51 or 52 a
25   couple of times in this deposition. In your

108

1    opinion, that concentration is where you
2    believe the problems may come from in this
3    case?
4    A.   I don't know. First of all,
5    you've got to understand, this sample was
6    taken at 6:00 in the evening on the next
7    day.
8    Q.   Okay.
9    A.   So it could have been higher. I
10   have no idea.
11       I cannot answer that question.
12   The sample was taken almost 24 hours later.
13   Q.   When I asked you about
14   concentration levels and what you looked at
15   in this case, you referred to this page?
16   A.   Yes.
17   Q.   Let me ask you the question again
18   and see if I can clarify it.
19       Did you refer to any materials or
20   can you direct me to any materials that can
21   provide me with a minimum concentration
22   level of diesel that is harmful or can cause
23   health effects from ingestion?
24   A.   I can and I will be happy to give
25   it to Mr. Gaines and he can pass it on to

MR. GAINES:

Objection. That has been asked and answered.

MR. BOLLINGER:

And he answered that it was 5000 parts per million and he has now changed that opinion.

MR. WILLARD:

Mr. Hardy's testimony was that it was 5000.

THE WITNESS:

I said one part.

MR. GOODIER:

I think the simple answer is he has no clue. He does not know. Is that correct, Doctor?

THE WITNESS:

I am saying that at 5000 parts per million or a 1/2 percent, I believe that you would have a problem. And at 1000 parts per million you would have a discomfort.

What the minimum amount is, I do not know.

EXAMINATION BY MR. BOLLINGER:

Q.    I think that's fair. You do not

---

I did not -- I did look up in certain books, but I do not have the information with me. I have to get it for him to get the exact number, what is the tolerance, what is the exposure level.

Q.    I want to clarify because we have referred a couple of times to this 52 parts per million.

You are referring to the Environmental Analytical Solutions report; correct? We had discussed it earlier in the deposition.

A.    Yes.

Q.    This report, the second to last line shows a TPH. Do you have that handy?

A.    Yes.

Q.    It shows a TPH which is a total petroleum hydrocarbon, is that your understanding of TPH?

A.    Yes.

Q.    Of a 51.6 milligrams per liter which equals two parts per million; correct?

A.    It's 51.6 parts per million.

Q.    We've referred to it as 51 or 52 a couple of times in this deposition. In your

---

know what the minimum level of concentration of diesel in water would need to be in order to cause health problems?

A.    I do not know. I also do not know what is the EPA level, the acceptable.

Q.    You seem to be confident with that 5000 parts per million in your opinion would cause a health problem?

A.    Yes.

Q.    Can you direct me to any literature to support that?

A.    I would have to check on specific articles and I will be happy to pass that on to Mr. Gaines and he can pass that on to you.

Q.    Okay. In preparing your expert opinion in this case did you investigate what levels of diesel fuel concentrations would cause harm?

A.    When I prepared, I used just the information that was given to me, based on the complaints of the various plaintiffs and the report of the St. Charles Parish Water Works, where it says 52 parts per million and the general information given to me.

---

opinion, that concentration is where you believe the problems may come from in this case?

A.    I don't know. First of all, you've got to understand, this sample was taken at 6:00 in the evening on the next day.

Q.    Okay.

A.    So it could have been higher. I have no idea.

I cannot answer that question. The sample was taken almost 24 hours later.

Q.    When I asked you about concentration levels and what you looked at in this case, you referred to this page?

A.    Yes.

Q.    Let me ask you the question again and see if I can clarify it.

Did you refer to any materials or can you direct me to any materials that can provide me with a minimum concentration level of diesel that is harmful or can cause health effects from ingestion?

A.    I can and I will be happy to give it to Mr. Gaines and he can pass it on to

In preparing your expert opinion
e, did you, specifically, refer
these materials?

I did see some. I do not remember
·day the name of the particular

But do you recall there being a
threshold?

Yes.

When I say a minimum threshold,
certain threshold there may be
fects and below that threshold
l not be health effects.

Is that what you understand it to

That is exactly what I understand
But we also have to qualify
ng. That is what the Government says
PA says, above this certain level or
his certain level is safe, below is
d above is unsafe.

Now, as I said earlier, I also
out to Mr. Hardy in his questioning,
pends on individuals. For some

---

1   the effect. What is the effect of that
2   exposure, not necessarily what the level is.
3       Q. Let me ask you this.
4           Assuming, hypothetically, that the
5   level of diesel in this case that was
6   ingested was below the level of whatever
7   materials that you are going to provide to
8   us, but people claimed that they got sick
9   from ingesting it.
10           Can you refer me to any reference
11  materials, any studies, any research,
12  anything that you have done yourself to
13  support this theory that that is what caused
14  their problem?
15      MR. GAINES:
16           I object. It calls for
17  speculation and that it distorts the
18  claimants complaints in the case. It's not
19  just ingestion. It's inhalation and
20  ingestion.
21      MR. BOLLINGER:
22           First of all, he's giving an
23  expert opinion and he can answer a
24  hypothetical. Second of all, I am going to
25  cover inhalation separate.

110

---

, like Mr. Goodier asked me, if a
drank water and I presume this water
have been contaminated with some
would that make him sick.

It may be that 99 out of a 100 no
But in one person it may have an

Q. Let me ask you about that.
I guess I will call it individual
vity that someone may have. You've
oned that a little bit. There may be
, but someone may be particularly
ive to a certain chemical; is that
ough?

A. There are situations.

Q. A situation where someone may be
ularly sensitive to a chemical, even
below a threshold that one of the
nce materials that you use says it's

Sounds like more of a medical
n rather than an opinion of a chemist.

A. No. I think it's more of a
st opinion than a medical opinion.
se a medical opinion deals more with

---

1       MR. GAINES:
2           Just for the record. That's fine.
3       A. Could you repeat the question?
4   EXAMINATION BY MR. BOLLINGER:
5       Q. Assume that there is a threshold
6   level which we have discussed a moment ago
7   of a level of diesel above which may cause a
8   harmful effect, below which will not cause a
9   harmful effect according to the literature
10  that you have referred to.
11          Assume that in this case the level
12  is below that threshold amount, but yet
13  people claimed to get sick from it. Can you
14  direct me to any reference materials or any
15  studies or any studies that you have
16  conducted or tests that you have conducted
17  that can support that claim?
18      A. Now you are saying, below that
19  level. We don't know what that level is and
20  I have to see what that level is and I would
21  have to check to see what the effect is.
22          This is a very hypothetical
23  question. I mean, I don't think that
24  question can really be answered in all
25  fairness.

112