FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2002 MAY 28  AM 8: 21

LORETTA G. WHYTE
CLERK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN THE MATTER OF AMERICAN COMMERCIAL | CIVIL ACTION |
| LINES, LLC, as Owner of the Barge | NO. 00-252 |
| LCD 4907, and AMERICAN COMMERCIAL | c/w 00-2967 |
| BARGE LINE LLC as Charterer and | c/w 00-3147 |
| Operator of the Barge LCD 4907, | SECTION:"N" |
| Praying for Exoneration from and/or | |
| Limitation of Liability | |

MEMORANDUM OPINION
DENYING CLASS CERTIFICATION

Before the Court is plaintiffs/claimants motion,[1] seeking certification of a class described as follows:

> [A]ll persons and/or entities who suffered injury and/or damage as a result of the subsequent release of toxic and hazardous substances, namely, diesel oil, from a barge in the Mississippi River, near the Orion Dock in St. Charles Parish at or about 9:45 p.m., and continuing for several hours on 7/28/99;[2] or

> [A]ll persons and/or other entities residing in the Parish of St. Charles, State of Louisiana, and who reside in geographic proximity to the Mississippi River, and who or which have sustained damages arising from the release and emission(s) of diesel fuel, which was released from the barge LCD 4907 and/or the Orion Refining Corporation's facility, including, specifically, all persons who reside in the Parish of St. Charles, State of Louisiana, who have sustained damages, physical, mental and/or emotional injuries, fright, inconvenience, and interruption of or intrusion into their personal lives as a direct consequence of this spill/release.[3]

---

[1] See Plaintiffs' Motion for Class Certification [Rec. Doc. No. 38].

[2] See Class Action Petition for Damages, at paragraph 2, filed in the matter entitled *Margie Richard, et al, v. American Commercial Lines LLC, et al,* Docket No. 53,756, Twenty-Ninth Judicial District Court for the Parish of St. Charles [USDC/EDLA Dkt.# 00cv2967 "N", Rec. Doc. No. 3].

[3] See Petition for Damages  and for Class Action Certification, at paragraph 3, filed in the matter entitled *Aaron Brown, et al. v. Orion Refining Corp., et al,* Docket No. 53,737E, Twenty-Ninth Judicial District Court for the Parish of St. Charles [USDC/EDLA Dkt.# 00cv3147 "N", Rec. Doc. No. 1].

DATE OF ENTRY
MAY 2 8 2002

Fee_____
Process_____
X Dktd_____
CtRmDep_____
Doc. No._____

An evidentiary hearing was conducted on April 24, 2002. Having considered the putative class

action plaintiffs' complaints, motion for class certification,[4] the submissions of the parties, the

evidence adduced at the oral hearing, the post-hearing briefs,[5] the record and the applicable law,

the Court is confident that the requirements for class certification under Federal Rule of Civil

Procedure 23(a) and (b)(3) are not met. For the following reasons, the putative class plaintiffs'

motion for certification is DENIED.

## I. BACKGROUND

This matter arises out of an incident that occurred on July 28, 1999 at approximately 9:45

p.m., involving a spill of diesel fuel into the Mississippi River near the intake, infrastructure,

valves and pipeline for the water system supplying east bank residents of St. Charles Parish,

Louisiana.[6] Putative class action plaintiffs submit that the quantity of #2 diesel oil spilled into

the Mississippi River was reported as five barrels or 210 gallons, but could have been as much

2,795 gallons of diesel fuel (*i.e.,* the estimated spill quantity reported in the December 28, 1999

Coast Guard penalty report, assessing a $5,000.00 penalty against petitioner-in-limitation,

American Commercial Lines, LLC ("ACBL")).[7]

The plaintiffs originally filed petitions for damages arising out of the spill event in state

court pursuant to Louisiana Code of Civil Procedure Article 591, asserting their claims under

Louisiana negligence and strict liability law,[8] and that they are entitled to maintain their causes as

---

[4] Rec. Doc. No. 38.
[5] Plaintiffs' Post-Hearing Memorandum in Support of Class Action Certification [Rec. Doc. No. 197]; and Defendants' Post-Hearing Brief in Opposition to Class Certification [Rec. Doc. No. 196].
[6] Testimony of Charles Toth, former director of the St. Charles Water Works.
[7] See Report of A. J. Englande, Jr. [Plaintiffs' Exhibit Englande "2"].
[8] See Louisiana Civil Code Articles 2315 and 2317.

a class action.[9]  Defendants removed claimants' state court lawsuits,[10] asserting the original

jurisdiction of the federal court pursuant to the Admiralty Extension Act ("AEA"), 46 U.S.C. §

740, over the class action claims against Orion Refining Corporation ("Orion") and the Parish of

St. Charles ("the Parish").[11]  Putative class plaintiffs' lawsuits arising out of the July 28, 1999

spill at Orion's dock involved ACBL's tanker barge (Barge LCD 4907), and thus were

consolidated with ACBL's related limitation action filed pursuant to 46 U.S.C. § 183.

Putative class action plaintiffs' complaints involve allegations of physical and emotional

injuries allegedly sustained by various residents of the close-knit community of east bank St.

Charles Parish, living in the area known as Norco, Louisiana.  Putative class plaintiffs claim

physical and mental injuries on account of both inhalation and drinking toxic elements of the

spilled diesel, which migrated down river and infiltrated the Parish's east bank waterworks

system supplying Norco residents.

---

[9]See Class Action Petition for Damages [USDC/EDLA Dkt.# 00cv2967 "N", Rec. Doc. No. 3]; and Petition for Damages  and Class Action Certification  [USDC/EDLA Dkt.# 00cv3147 "N", Rec. Doc. No. 1].

[10]See Notice of Removal filed in *Aaron Brown, et al. v. Orion Refining Corp., et al*, Docket No. 53,737E, Twenty-Ninth Judicial District Court for the Parish of St. Charles [USDC/EDLA Dkt.# 00cv3147 "N" Rec. Doc. No. 1]; and Notice of Removal filed in *Margie Richard, et al, v. American Commercial Lines LLC, et al,* Docket No. 53,756, Twenty-Ninth Judicial District Court for the Parish of St. Charles [USDC/EDLA Dkt.# 00cv2967 "N", Rec. Doc. No. 3].

[11]The AEA provides in pertinent part: "The admiralty and maritime jurisdiction of the United States shall extend to and include all cases of damage or injury, to person or property, caused by a vessel on navigable water, notwithstanding that such damages or injury be done or consummated on land." 46 U.S.C. § 740.

Putative class plaintiffs seek certification under Federal Rule of Civil Procedure 23(b)(3),
which applies to suits seeking compensatory damages involving common questions of law or fact
which predominate over any questions affecting only individual members, such that a class
action is the superior method of adjudicating the controversy fairly and efficiently.  The predicate
to the plaintiffs' claims is that exposure to the vapors and drinking water contaminated by the
elements of diesel fuel from the spill caused their personal injuries.   Plaintiffs assert that the
exposure that gave rise to their injuries occurred during the twenty-four hour period following the
spill on the evening (*i.e.,* 9:45 p.m.) of July 28, 1999.  They contend that injury and causation can
and should be addressed within this time frame since the universe of injured claimants are
confined to those east bank residents of St. Charles Parish, and that the class-action format is the
superior method of adjudicating their claims because common issues predominate.

## II. CLASS CERTIFICATION STANDARDS

Rule 23 of the Federal Rules of Civil Procedure governs class actions.   The rule requires
that the court determine, "as soon as practicable" after an action brought on behalf of a class is
commenced, whether the suit meets the class certification requirements such that the case should
proceed as a class.[12]   A class action is not maintainable as such simply because the lawsuit
designates the cause as a class action.  It is not disputed that the class action proposed in this case
must satisfy the requirements for certification outlined in Rule 23 (a) and (b).

---

[12]See Fed. R. Civ. P. 23(c)(1); *Castano v. American Tobacco Company*, 84 F.3d 734, 741
(5th Cir. 1996).

4

In ruling upon a motion for class certification, courts treat the substantive allegations contained in the plaintiffs' complaint as true. The issue is not whether the plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met.[13] The court may look past the pleadings to the record and any other completed discovery to make a determination as to the class certification issue.[14]

At the outset, Rule 23(a) sets forth four threshold requirements which must be met in every type of class action case.[15] Rule 23(a) requires that a class: (1) be so numerous that joinder of all members is impractical [numerosity]; (2) have common questions of fact or law [commonality]; (3) have representative parties with typical claims or defenses [typicality]; and (4) have representative parties that will fairly and adequately protect the interests of the proposed class [adequacy].[16] The first two requirements focus on the characteristics of the class; the second two focus instead on the desired characteristics of the class representatives. The rule is

---

[13]*Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177-78, 94 S.Ct. 2140, 2153 (1974); see also *Burrell v. Crown Central Petroleum, Inc.,* 197 F.R.D. 284, 286 (E. D. Tex. 2000); and *In re Lease Oil Antitrust Litigation*, 186 F.R.D. 403, 418 (S. D. Tex. 1999).

[14]See *General Telephone Company v. Falcon,* 457 U.S. 147, 161, 102 S.Ct. 2364, 2371-72 (1982)(noting the district court's duty to conduct a "rigorous analysis" before granting class certification and holding that a decision on class certification remains a fact specific determination); *Spence v. Glock,* 227 F.3d 308, 310 (5th Cir. 2000); and *Castano v. American Tobacco Co.*, 84 F.3d 734, 740 (5th Cir. 1996).

[15]See *James v. City of Dallas*, 254 F.3d 551, 569 (5th Cir. 2001).

[16]See Fed. R. Civ. P. 23(a); *Spence v. Glock,* 227 F.3d at 310 n. 4; *James v. City of Dallas,* 254 F.3d at 569.

5

designed "to assure that courts will identify the common interests of class members and evaluate the named plaintiffs' and counsel's ability to fairly and adequately protect class interests."[17]

If the Rule 23(a) criteria are satisfied, the plaintiffs must show that class treatment is appropriate under one of three alternative class categories prescribed by Rule 23(b).[18] Plaintiffs claim only monetary damages, and explicitly seek certification solely pursuant to Rule 23(b)(3), which sets out two requirements – predominance and superiority.  See Fed. R. Civ. P. 23(b)(3).  Subsection (b) provides that:

> (b) An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:
> ...
> (3) the court finds that the *questions of law or fact common to the members of the class predominate* over any questions affecting only individual members, *and* that a *class action is superior* to other available methods for the fair and efficient adjudication of the controversy.  The matters pertinent to the findings include: (A) the interest of the members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.[19]

To pass muster under Rule 23(b)(3), plaintiffs must sufficiently demonstrate both predominance of common class issues and that the class action mechanism is the superior method of adjudicating the case.[20]  Together, subsection (a) and (b) requirements insure that a proposed

---

[17]*In re Lease Oil Antitrust Litigation,* 186 F.R.D. at 419 (citing *In re General Motors Corp. Pick-Up Truck Fuel Tank Litigation,* 55 F.3d 768, 799 (3rd Cir. 1995)).

[18]See Fed. R. Civ. P. 23(b); *James v. City of Dallas,* 254 F.3d at 568.

[19]Fed. R. Civ. P. 23(b)(3) (emphasis supplied).

[20]See *Mullen v. Treasure Chest Casino, LLC,*  186 F.3d 620, 623-24 (5th Cir. 1999)(citing *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 614 (1997)).

6

class has "sufficient unity so that absent class members can fairly be bound by decisions of the class representatives."[21]

In *Allison v. Citgo Petroleum*,[22] the Fifth Circuit explained the different categories of class actions detailed in Rule 23(b), as follows:

> Under Rule 23, the different categories of class actions, with their different requirements, represent a balance struck in each case between the need and efficiency of a class action and the interests of class members to pursue their claims separately or not at all. The different types of class actions are categorized according to the nature or effect of the relief being sought. The (b)(1) class action encompasses cases in which the defendant is obliged to treat class members alike or where class members are making claims against a fund insufficient to satisfy all claims. The (b)(2) class action, on the other hand, was intended to focus on cases where broad, class-wide injunctive or declaratory relief is necessary. Finally, the (b)(3) class action was intended to dispose of all other cases in which a class action would be "convenient and desirable," including those involving large-scale, complex litigation for money damages. Limiting the different categories of class actions to specific kinds of relief clearly reflects a concern for how the interests of the class member will vary, depending on the nature of the class injury alleged and the nature of the relief sought.[23]

A class seeking substantial money damages will more likely consist of members with divergent interests.[24] Recognizing that monetary damages are more often related directly to the disparate merits of individual claims, the drafters of the rule saw fit to provide prospective (b)(3) class members the absolute right to notice, to opt out and not be bound by membership in a class.[25]

---

[21]*Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 117 S.Ct. 2231, 2246 (1997).

[22]*Allison v. Citgo Petroleum Corp.,* 151 F.3d 402 (5th Cir. 1998).

[23]*Id.* at 411-12.

[24]*Id.* at 412.

[25]*Id.*

Rule 23(b)(3) applies to cases for which a class action would achieve economies of time, effort, and expense, promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.[26]   Whether common issues predominate and the class action is superior requires an understanding of the relevant claims, defenses, facts, and substantive law presented in the case.[27]

In the case at bar the plaintiffs bear the burden of proving that: (1) the proposed class satisfies all of the elements of Rule 23(a); and (2) the proposed class also satisfies both requirements of Rule 23(b)(3).[28]   Within the confines of Rule 23, a district court maintains substantial discretion in determining whether to certify a class.[29]   In the absence of proof of all required elements, the court may not certify a class.[30]   The Court addresses the plaintiffs' proof as to requisite elements of a Rule 23(b)(3) class action serially herein.

---

[26]See *Amchem*, 521 U.S. at 615, 117 S.Ct. at 2246.

[27]See *Berger v. Compaq Computer Corporation*, 257 F.3d 475, 483 (5th Cir. 2001)("'[T]he class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action.'" *Castano*, 84 F.3d at 744.).

[28]See *Spence v. Glock*, 227 F.3d at 310; *Berger*, 257 F.3d at 479-80; *Mullen*, 186 F.3d at 623; and *Castano*, 84 F.3d at 743-44 (holding that a court cannot rely on assurances of counsel that any problem with predominance or superiority can be overcome).

[29]See *Smith v. Texaco*, 263 F.3d 394, 403 (5th Cir. 2001)(recognizing that the certification inquiry is essentially fact based and thus the Fifth Circuit defers to the district court's inherent power to manage and control pending litigation, reviewing certification decisions only for abuse of discretion).

[30]See *Berger*, 257 F.3d at 479-80.

8

## III. EVIDENTIARY HEARING

Margie Richard ("Richard"), a retired teacher and student in theology who is active in the community affairs of the residents of Norco, Louisiana, testified that she presently lives on west bank of the river in Destrehan.  However, at the time of the incident she lived on 28 Washington Street in Norco, Louisiana, where she had lived most of her life.  Ms. Richard, admittedly "not a water drinker," testified that she did drink some on the morning of June 29, 1999 when taking her medications, and also used the water bathing.   She testified that at night on June 29th, she could smell a diesel odor when she turned on the water.  She experienced a throat irritation two days later, headache, stomach ache, nausea and panic.  Her symptoms lasted approximately a month.

Richard testified that she is the type of individual that takes care of herself and was fearful of chronic effects, so she saw Dr. Alleman, and was given ampicillin for the irritation of her throat.  She further testified that she had previously been a victim and explained in cross-examination that she participated in another class action against Union Carbide for exposure to a steam release allegedly containing methyl ethyl ketone ("MEK").  As to her awareness of any other individuals in the community who exhibited symptoms, Richard testified that her children had sensitive skin, and were scratching because they had taken a bath in the tainted water.  She also testified that they experienced some diarrhea.  When asked about her awareness of other residents' problems with respect to the exposure involved in this particular case, Richard simply testified that the incident was the talk of the town without any further explanation.  Richard testified that she is a member of the board of the environmental justice department associated

9

with Tulane, Louisiana State University ("LSU"), Rutgers and Xavier University, and that she is involved with community monitoring of environmental issues affiliated with the Environmental Protection Agency Board for the Petroleum Sector.

Gaynell Marie Johnson ("Johnson") testified that at the time of the subject spill, she lived at 123 Diamond Road in Norco, Louisiana. Ms. Johnson also no longer resides in Norco, but has since moved to Laplace, Louisiana. She admittedly suffered from a number of medical conditions at the time of the spill, including arthritis, a heart condition, residuals from a stroke in 1992, and asthma. Johnson testified that both she and her husband are disabled. On the evening of July 28, 1999, Johnson testified that she stayed up late making a gumbo and drank about two glasses of water. Unlike Richard, who simply drank water to take her medications, Johnson testified that she was a "water drinker," *i.e.*, she habitually drank a lot of water every day. Johnson testified that she became very sick that night with nausea and stomach cramps at approximately 1:00 a.m. in the morning. She testified her husband experienced similar symptoms. Her symptoms subsided by noon the next day and her husband's symptoms got better in one to two days.

Johnson also testified that she was a volunteer in the community organization, Concerned Citizens of Norco, which was formed to help protect the community from exposure to chemicals allegedly emanating from the chemical plants in the area. When questioned about any fear she experienced along with her nausea and cramping, Johnson stated matter-of-factly that she is always fearful, explaining that she lived in fear because of the community's situation between two chemical plants. Smith was cross-examined regarding her prior deposition

10

testimony regarding her belief in filing law suits as a form of protest to "teach" the chemical plants "a lesson."

Samuel Price ("Price") testified that he tasted the water at around noon on June 29th, and approximately 15 minutes later, he began experiencing symptoms. Price testified that he and his wife suffered about three days with nausea after the spill. According to Price, that brief illness did not result in any change in his lifestyle.

Alvin Smith ("Smith") testified *via* deposition that the water smelled and tasted "greasy." Two of his daughters vomited, and the rest in his family felt "queasy." Smith further testified that he experienced some nausea, and dizziness or light-headedness, but that could be attributable to "senility."[31] Smith did not see a doctor. Smith testified that as soon as he and members of his family noticed the problem with the water on the morning of July 29, 1999, they stopped drinking it.[32] Their symptoms lasted only a couple of days.[33] Smith acknowledged that he lived within blocks of Diamond and Washington Streets, emphasizing that the affected community of Norco, Louisiana, is very small, bounded by the Shell Refinery on one side and the Shell chemical plant on the other.[34]

Shelley Moliere Rainey ("Rainey") testified *via* deposition that she first noticed the taste and an odor similar to that of "exhaust" on the morning of July 29th, when she took a vitamin.[35]

---

[31]Deposition of Alvin Smith, at p. 49 [Plaintiffs' Exhibit Smith "1"].
[32]*Id.* at pp. 45-50.
[33]*Id.* at p. 46.
[34]*Id.* at pp. 54, 56 (noting that Diamond was the "Canal Street" of Norco, dividing the community in half).
[35]Deposition of Shelly Moliere-Rainey, at pp. 13-15 [Plaintiffs' Exhibit Rainey "1"].

Rainey and her son live at home with her parents, brothers and sisters on Ormond Boulevard in

Norco, Louisiana.  Rainey testified that she was the only one in her household who noticed and

commented about the water on the morning after the spill.  Rainey proceeded to work that day,

and drank about a half of a cup of the water at work in the form of herbal tea on that afternoon of

July 29, 2002.  She testified that other office workers commented that something was wrong with

the water.[36]   Rainey did not find out that there had been a chemical spill until the afternoon.

She experienced symptoms on the evening of July 29th, 1999, consisting of a nauseated feeling

and a hoarseness in her throat.  She did not miss any work or any activities, and did not see a

doctor on account of her symptoms.[37]   Rainey testified that she did not consult a physician until

the early part of 2002, and then only pursuant to her lawyer's recommendation, "to make sure

everything was okay."[38]   Her symptoms lasted only about a day and a half.  Rainey's two year

old son experienced dry skin problems in the days following the incident.  The skin condition

was treated with Nizoral [39] cream.  Rainey could not recall complaints from anyone else in the

family.  She also did not know if any of her co-workers suffered ill-effects.  Other than her own

experience with the water on July 29, 2002, Rainey did not know much about the incident, and

---

[36]*Id.* at 16.

[37]*Id.* at 24.

[38]*Id.* at 25.

[39]Nizoral cream (ketoconazole) is a broad spectrum antifungal agent which inhibits the *in vitro* growth of common dermatophytes and yeasts by altering the permeability of the cell membrane.  *In vitro* studies suggest that ketoconazole impairs the synthesis of ergosteraol (a vital component of the fungal cell membrane).  It is indicated for topical use in treatment of skin fungi and yeast infections and in the treatment of sebborrheic dermatitis.  Its safety and effectiveness for pediatric use have not been established.  See Physician's Desk Reference (PDR), 53rd edition (1999), at p. 1427.

was unaware of individuals in the community who might have been affected. She could recall no complaints of sickness or injury from anyone and never noticed anyone getting sick, except for her own slow feeling and her son's dry skin patches.[40]   It is clear from Rainey's deposition testimony that the sum and substance of what she knows about the incident, and the effect, if any, it had on the community, emanates either from her attorney or the workplace "rumor mill."

Scouring the fifty service orders[41] submitted by St. Charles Parish east bank residents for reports of illness, the Court found only one contemporaneous complaint of illness related by a Norco resident named Joan Vass (*i.e.*,"hurting stomach"). Not one of the other forty-nine service orders report a complaint of any illness experienced by east bank residents of St. Charles Parish. The service orders uniformly report complaints of a bad, strong, or oily smell or bad or chemical taste, or both.[42]

Dr. Evans testified *via* deposition that he had the occasion to see only two of the St. Charles residents who complained of ill-effects, which they related to exposure to diesel. The two patients were not evaluated by Dr. Evans until January of 2002, a year and a half after the subject incident. [43] Dr. Evans, a general practitioner in the New Orleans area, testified that he had seen no other patients relating symptoms to the July 28, 1999 spill.[44]   The only other medical

---

[40]Deposition of Shelly Moliere-Rainey, at pp. 26-28 .
[41]See St. Charles Parish Department of Waterworks' Service Orders dated July 29 and 30, 1999 [Plaintiffs' Exhibit Toth  "4" *in globo*].
[42]Forty-four of the service orders contain notations regarding the bad smell of the water, and only fifteen mention the bad taste, or both bad taste and smell. *Id.*
[43]See Deposition of Dr. Henry M. Evans, Jr., at pp. 16-19, 23-24, 85-109 [Plaintiffs' Exhibit Evans "2"].
[44]*Id.* at pp. 23-24.

records memorializing any complaints of physical, mental or emotional injury suffered by residents of St. Charles Parish are those of Dr. Earl Alleman, regarding Margie Richard's one visit on August 31, 1999, over a month after the spill, relating her complaints of nausea, diarrhea and headaches to her exposure to diesel oil in the water on July 28, 1999. Dr. Alleman's records regarding Gaynell Johnson's August 16, 1999 visit do not relate her symptoms of gastro-enteritis to diesel oil in the water and do not mention the spill of July 28, 1999.[45]

Plaintiffs also called Charles Toth, the director of St. Charles Parish Waterworks at the time of the July 28, 1999 spill, as a witness at the evidentiary hearing. He testified that at around 7:00 a.m. on July 29th, Grant Walsh, a senior technician at the east bank waterworks facility, noticed an odor of diesel in the parking lot upon his arrival for work. When he entered the plant, Walsh noticed a petrol sheen on the surface of the water clarifiers. Plant intake was shut down as a precautionary measure. Flushing was initiated to rid the distribution system of tainted water. Neighborhood complaints were received, however, within a two day period, the Norco residents' complaints ceased. Mr. Toth testified that testing accomplished by certified laboratories on July 29th and 30th indicated the presence of elements of diesel far below the level necessary to produce ill health effects.[46]

---

[45]See Dr. Earl Alleman's Records dated 8/31/99 and 8/16/99 [Joint Exhibit "3"].

[46]See also Expert Report of Dr. William George, Professor of Pharmacology and Director of Toxicology at Tulane University School of Medicine, dated April 11, 1993, which similarly provides that: (1) symptoms such as headache, nausea, dizziness, etc. are unlikely in the case of residents, who did not claim exposure to high concentrations of diesel vapor in the air, but rather claim exposure in the course of bathing in and/or consuming contaminated water; (2) the low concentration of diesel/components in the processed water, which according to tests results, contained less that 1 part per million ("ppm") of diesel (*i.e.,* less than the minimal detection

14

Dr. Henry Evans, plaintiffs' expert witness, who had the occasion to evaluate two patients in January of 2002, long after the incident in question, did not hold himself out as an expert in the field of toxicology.[47]  Dr. Evans agreed that there was a *de minimus* exposure level of diesel/water concentration, a minimal level below concentration which would not cause any harm to the average human being.  However, he expressed no opinion as to what level or range that might be, whether 1 ppm or 50 ppm.[48]

Although the merits of the plaintiffs' substantive allegations are not the focus of the Court's inquiry in making a determination with respect to the issue of certification, plaintiffs submitted expert reports and/or deposition testimony of several expert witnesses whose perfunctory opinions pertain to the merits, but are not grounded in the facts of this case at all, and thus provide only superficial analysis.  Whereas plaintiffs' experts in the fields of chemistry, environmental engineering, and toxicology, *i.e.*, Dr. Gordon Goldman, A. J. Englande, and Sharee Rusnak,  may be experts in their respective fields of study, their opinions as to causation-in-fact and the credibility of complainants' alleged symptomotology lend little, if any, assistance to this Court in making a determination on the issues inherent in the certification analysis.  To the extent that such experts' opinions are relevant, they reinforce this Court's opinion that the predominance factor is not met in this case.[49]

---

levels; and (3) at such low levels there would be no expected adverse health effects.  [Defendant's Exhibit George "3"].

[47]See Deposition of Dr. Henry Evans, at pp.24-31 [Plaintiff's Exhibit Evans  "2"].

[48]*Id.* at 50-52, 56, 57.

[49]See note 78 *infra*, and accompanying discussion at pp. 26-27.

As previously discussed, for purposes of discussion and analysis of the appropriate factors, the Court assumes that diesel from the July 28, 1999 spill at Orion's dock entered the St. Charles Parish waterworks plant on the east bank of the river, that drinking water tainted with elemental components of diesel of an undetermined concentration was distributed to the homes of putative class plaintiffs (residents of Norco, Louisiana), and that some residents suffered injuries on account of the presence of elements of diesel in their drinking water.

## IV. DISCUSSION

### A. Rule 23(a) Requirements

### 1. Rule 23(a)(1): Numerosity

As to numerosity, a plaintiff must ordinarily demonstrate some evidence or reasonable estimate of the number of purported class members.[50] Numerically speaking, a class of over one hundred members is sufficient for purposes of numerosity and actual numbers are not determinative of the inquiry.[51] In addition to numbers, factors relevant to the numerosity inquiry include the geographical dispersion of the class, the ease with which class members may be identified, the nature of the action, and the size of each plaintiff's claim.[52]

Plaintiffs presented very little evidence to the Court in satisfaction of the numerosity inquiry. In terms of sheer numbers of physically, mentally and emotionally injured potential

---

[50]See *James*, 254 F.3d at 570.
[51]See *Street v. Diamond Offshore Drilling*, 2001 WL 568111, at 4 (E.D. La. May 25, 2001)(Duval, J.)("Although the number of members in a proposed class is not determinative of whether joinder is impracticable, it has been noted that any class consisting of more than forty members 'should raise a presumption that joinder is impracticable.'")
[52]See *Mullen*, 186 F.3d at 624.

class members, direct evidence of such was absent.  Moreover, consideration of the concise

geographical area to which the exposure was confined, together with the fact that the individuals

affected were members of a very close-knit community, militates against a finding of numerosity.

      The fact remains that class members may not have much incentive to bring individual

actions because of the amount of perceived damages.  Assuming that injuries were sustained on

account of the spill, it appears from the evidence adduced at the evidentiary hearing that only in

the rare case (*i.e.*, the case of the two or three of the named putative class plaintiffs) did such

illness or injury either warrant any  contemporaneous complaint of illness to Parish officials, a

local doctor, or even to a lawyer.  Whether due to the admitted short period of exposure to the

elements of diesel fuel from the spill, or other factors, evidence adduced at the evidentiary

hearing and discernible from the record are insufficient to allow the Court to presume, for the

purposes of the pending motion, that the class would contain a sufficiently large number of

members *whose joinder would be impracticable.*

    In sum, the named representative plaintiffs' own accounts admit that the Norco

community affected in any manner or means by the July 28, 1999 spill is indeed a succinct, easily

identifiable group of people, all residing in close proximity.   Parish waterworks records reflect

some 50 complaints of bad taste, bad odor, or both, within a day or two following the incident,

with only one complaint of illness.  The resident physician, Dr. Earl Alleman, apparently treated

only two patients, one of whom related her illness to the spill incident, and then only after a full

month elapsed.  Putative class plaintiffs produced no evidence to the effect that area hospitals,

health care providers, and/or physicians had more than the usual numbers of patients in general,

or that area businesses were adversely affected or even mildly interrupted by a twenty-four hour water quality problem experienced on account of the spill. Rather, the evidence suggests that less than ten Norco residents related symptoms of nausea, diarrhea, or headaches to a health care professional within the days or weeks following the incident.

On the other hand, assuming without deciding that the 1600 sworn statements of Norco residents/claimants in the limitation proceeding (*i.e.*, relating one or more illnesses to their exposure to diesel on account of the July 28, 1999 spill) suffice for purposes of Rule 23(a)(1)'s "numerosity" requirement, the Court will proceed with its analysis of the certification issues.

## 2. Rule 23(a)(2): Commonality

The test of commonality is not demanding.[53]   The interests and claims of the various plaintiffs need not be identical. Rather, the commonality test is met when there is at least one issue whose resolution will affect all or a significant number of the putative class members.[54] The fact that some of the plaintiffs may have different claims, or claims that may require individualized analysis, will not defeat commonality.[55]

In this case, the potential members of the plaintiffs' class share a common factual circumstance of allegedly suffering some degree of physical and/or emotional injuries from having their drinking water tainted with elements of diesel fuel spilled into the Mississippi River at or near Orion's dock and upstream from St. Charles Parish Waterworks Department's intake

---

[53]See *Mullen,* 186 F.3d at 625.
[54]*James,* 254 F.3d at 570(citing *Forbush v. J.C. Penney Co.,*994 F.2d 1101, 1106 (5th Cir. 1993)(quoting *Stewart v. Winter*, 669 F.2d 328, 335 (5th Cir. 1982)).
[55]*Id.*

18

pipe in the Mississippi River. Potential class members also share a common legal theory – *i.e.*, that the conduct of the defendants is actionable under Louisiana law of negligence, pursuant to Article 2315 of the Louisiana Civil Code. One or the other is sufficient to meet the requirement of commonality.

Defendants to not dispute that the plaintiffs met their burden of proof with respect to Rule 23(a)(2)'s commonality requirement. Thus the Court need only consider the issue of commonality in the context of Rule 23(b)(3)'s more rigorous "predominance" test.[56]

### 3. Rule 23(a)(3): Typicality

Rule 23(a)'s typicality requirement does not require a complete identity of claims. It focuses on the similarities between the named plaintiffs' legal and remedial theories and the theories of those whom they purport to represent.[57]

> [T]he critical inquiry is whether the class representatives' claims have the same essential characteristics of those of the putative class. If the claims arise from a similar course of conduct and share the same legal theory, factual differences will not defeat typicality.[58]

---

[56]7A Wright, Miller & Kane, *Federal Practice and Procedure,* § 1763, at 227 (2d ed 1986)(noting the partial redundancy of (a)(2)'s commonality requirement, since the existence of a common question can be viewed as an essential element of (b)(3)'s requirement that common questions predominate over individual issues).

[57]*James,* 254 F.3d at 571.

[58]*Id.* (citations omitted).

Like commonality, the test of typicality is not demanding.[59]  However, to satisfy Rule 23(a)'s

typicality requirement, a class representative must be a part of the class and possess the same

interest and suffer the same injury as class members.[60]   In the case at bar, the named plaintiffs

allege  the same legal theories of recovery arising out the same incident, an oil spill on the

Mississippi River.  The putative class plaintiffs all seek the same remedies, *i.e.*, compensatory

damages for physical, mental and emotional injuries and fright.

Defendants do not dispute that the typicality requirement is satisfied in this case, and that

the claims asserted by Margie Richard, Samuel Price and other named representatives are based

on the same theories of liability as potential class members.[61]

### 4. Rule 23(a)(4): Adequacy

The fourth and final requirement of Rule 23(a) is that the district court must find that the

representative parties will fairly and adequately protect the interests of the class.[62]  Rule 23(a)'s

adequacy requirement encompasses consideration of the class representatives, their counsel, and

the relationship between the two.  Adequacy of the representation of the class cannot be

---

[59]*Id.*; see also *Mullen,* 186 F.3d at 625 (typicality satisfied when plaintiff employees alleged theories of liability for defective air ventilation aboard casino boat under Jones Act and doctrine of unseaworthiness, despite the defendant's argument that each class member's alleged resulting "respiratory illness" may differ).

[60]See *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 156, 102 S.Ct. 2364, 2370 (1982).

[61]See Defendants' Post-Hearing Memorandum in Opposition to Class Certification, at p. 7.

[62]Fed. R. Civ. P. 23(a)(4).

presumed.[63]   The adequacy requirement contemplates the absence of antagonistic or conflicting interests, and a sharing of interests between class representatives and absentees.    As it should, this Court has assumed for the purposes of this motion for class certification that the injuries alleged by putative class plaintiffs could have and did indeed occur.

The Fifth Circuit in *Berger* emphasized that the party seeking certification bears the burden of establishing that *all* requirements of Rule 23(a) have been satisfied, and that it is error to presume the adequacy of the putative representatives in the absence of specific proof otherwise.[64]  The *Berger* court observed:

> To the contrary, we have described "[t]he adequacy requirement [as one that] mandates an inquiry into ... the willingness and ability of the representatives to take an active role in and control the litigation and to protect the interests of the absentees."  Likewise, ... "it must appear that the representative[s] will vigorously prosecute the interests of the class through qualified counsel."  Both understandings – even accepting the variance between them – require the class representatives to possess a sufficient level of knowledge and understanding to be capable of "controlling" or "prosecuting" the litigation.[65]

Class action lawsuits are intended to serve as a vehicle for capable and committed advocates to pursue the goals of the class members through counsel, not for capable, committed counsel to pursue their own goals through those class members.[66]

There is a complete absence of proof regarding the named class representatives' activities with respect to the <u>instant</u> litigation.  Named class representatives were unable to testify first-

---

[63]See *Berger*, 257 F.3d at 479-80.
[64]*Id.* at 479.
[65]*Id.* at 482-83 (citations omitted).
[66]*Berger,* 257 F.3d at 484.

hand regarding the plight (*i.e.*, illnesses) suffered by others in the Norco community outside of the individuals who either reside in their household or comprise their close family members. Ms. Richard testified as to no particular specifics regarding the adverse health effects to members of the community outside of her immediate family.

Alvin Smith, intending to serve as a class representative, was present briefly just prior to the commencement of the class certification hearing, but inexplicably left the Courthouse and did not return to testify in support of class certification as scheduled.[67]    Review of Mr. Smith's deposition testimony reveals that: (1)  he did not know the location of the spill; (2)  he did not view any television programs or review any news that described what happened in the incident; and (3) he did not attend any meetings with Parish officials, the Parish Waterworks' Department, or consult any other sources about the spill.[68]    Smith could not even say for sure whether his own children were treated by a physician on account of adverse effects of drinking the water.[69] Without question, the requisite zeal on the part of Smith is sorely lacking, even with respect to his own claim for monetary damages against the defendants.  Moreover, the Court cannot find on this record that the shortcomings on Smith's part are diffused or counterbalanced by the competence or zeal of the few class representatives who appeared and testified live at the evidentiary hearing.

---

[67]The defendants withdrew their objection to admitting Smith's deposition testimony in lieu of his live testimony at the hearing.

[68]Deposition of Alvin Smith, Jr., at p. 48.

[69]*Id.* at p. 47.

Shelley Moliere Rainey could only speak for herself, her mother and her infant son. She testified in deposition specifically that she could not even speak for her dad or her brothers and sisters, who occupied the same household.[70] Rainey testified that after the incident she did not inquire into the situation of any of her neighbors, co-workers or anyone else the community, either regarding information about the spill or its effect on individuals in the community.[71] It is clear that Rainey has not taken an active role in the litigation. The full extent of her participation is reactive, and not proactive. Rainey testified that she simply filled out a claim form that was delivered to her at work sometime in June of 2001, and then mailed back.[72] She admittedly did not perform any independent inquiry into the nature or size of the spill, or the effects thereof, and has made no efforts to determine what company was responsible, and/or whether or not the offending party had been fined.[73]

Not one named class representative fostered the impression that he or she has or had his or her hands on the pulse of the case. It was not apparent that any one or more of the named representatives had assumed an active role in the litigation *vis a vis* the prosecution of a "class" of claims aside from their participation in the evidentiary hearing on class certification.

The Court has not ignored and cannot ignore the testimony of Richard and Johnson to the effect that both are generally concerned with issues of environmental justice, and in fact have a special advocacy interest in such issues. Richard's community involvement as a past-president of

---

[70]Deposition of Shelley Moliere-Rainey, at pp. 21-22, 28-29.
[71]*Id.* at p. 29.
[72]*Id.* at pp. 36-37.
[73]*Id.* at p. 39.

23

Norco Concerned Citizen's organization and as a board member of the Environmental Protection

Agency Board for the Petroleum Sector are sincerely held commitments. The same is true of

Johnson's past community activity concerning issues of "environmental justice." However, both

named representatives Richard and Johnson no longer reside in Norco. Even assuming that both

remain in close contact with area residents, not a shred of evidence suggests that Richard and

Johnson have done so for the purpose of taking an active role in seeking redress for injuries *via*

the subject litigation. Indeed, it appears their participation, albeit in name only, rather serves the

purpose of ideologies embraced by organizations which they serve (*i.e.*, ideologies which they

hold dear). Further assuming that Johnson's disability due to numerous health problems[74] would

not prevent her from taking an active role in guiding the course of the instant litigation, the Court

must express real concern that her professed agenda regarding "environmental justice" (*i.e.*,

teaching corporate perpetrators of environmental injustice "a lesson") may well conflict with the

less complex much larger interest of the absent class members, who simply seek to secure the

recovery monetary damages sufficient to compensate them for their alleged physical, mental and

emotional injury, *i.e.*, to be "made whole," as a result of the single incident of July 28, 1999.

The Court further recognizes that potential differences such as allergies, sensitivity,

personal habits, and preexisting disabilities[75] may create variances in the ways that the named

---

[74]Johnson testified that she is (1) a disabled stroke victim, (2) no longer lives in Norco, and (3) suffers from a number of debilitating afflictions, including asthma, arthritis, a heart condition, and residuals from a stroke.

[75]To be illustrative, the Court reiterates the testimony of Johnson that she is disabled and drinks a lot of water, whereas Richard testified that she is in good health and is "not a water drinker."

24

plaintiffs and potential class members prove causation and damages, but such differences do not affect the alignment of their interests.[76]   Nevertheless, no evidence was adduced demonstrating that the named plaintiffs were even close to fluent with the progress of the litigation and/or have made themselves available as a liaison between their counsel and the absent members.  Whether or not the named plaintiffs were at any time in the past and/or are presently active in community organizations, regarding environmental issues in general or otherwise, is not the panacea.

This Court cannot presume adequacy of class representation.  At best, the evidence suggests that two of named representatives (Richard and Johnson) are vocal and active participants in organized efforts to quell alleged environmental injustice.  However, evidence of their active participation or an intention to become actively engaged in controlling the course of the instant litigation is absent.  Because plaintiffs failed to adduce sufficient evidence to satisfy the requirement of adequacy as to their own representation, the Court need not and does not address the competency of counsel prong of the adequacy analysis.

## B.  Rule 23(b)(3): Predominance and Superiority

In *Castano v. American Tobacco Company*, 84 F.3d 734 (5th Cir. 1996), the Fifth Circuit made it clear that deciding whether common issues predominate and whether the class action is the superior method to resolve the controversy requires an understanding of the relevant claims, defenses, facts, and substantive law presented in the case.[77]   The plaintiffs' class proposal fails to

---

[76]See *Mullen*, 186 F.3d at 626.
[77]*Castano*, 84 F.3d at 744.

satisfy Rule 23(b)(3)'s requirement that the common questions of law or fact *predominate*.  The Rule's express language indicates that for a class to be certified under 23(b)(3), there must not simply be some commonality of issues among claims.  Rather the issues that are common must *predominate* over individual issues.

As to plaintiffs' claims for compensatory damages under Louisiana law, the focus is almost entirely on facts and issues specific to individuals, rather than as to the class as a whole. Even according to the plaintiffs' experts,[78] causation and damages will turn on the following varying individual factors: (1) extent of the exposure of each class member; (2) sensitivities which may be found to exist in individual members of the class which might have precipitated the same symptoms; (3) the mental or emotional stability of each class member; (4) how the injuries may have impacted the individual class member's ability to work or function in daily life; (5) varying medical treatment, if any, each plaintiff received; (6) the expense of such treatment, and so on.  Factors such as age, weight, sex, preexisting conditions, and medical history are expected to play a dominant role in resolution of this litigation.   Additionally, the predominant ailments (*i.e.*,  headaches, nausea, dizziness, and sore throat) are quite common maladies which may be caused by any number of factors other than the individuals' varying types of and degree of

---

[78]See Deposition of Sharee Major Rusnak, at 70 (noting that she did not know how long it took St. Charles Parish east bank residents to manifest symptoms, and that would depend vary between individuals, according to a number of factors including whether th person was an adult or a child)[Plaintiffs' Exhibit Rusnak "3"]; and Deposition of Gordon Goldman, at p. 8, 71-72, 109, 135 (testifying that (1) the level of exposure could have an effect on some individuals and absolutely no effect on others, (2) concentration of diesel may pe *partly responsible for health problems,* (3) a lot depends on individuals, and (4) different people have different sensitivities)[Plaintiffs' Exhibit Goldman "3"].

exposure to the elements of diesel fuel during the 24-hour period following the spill. As for

fright and emotional injury, Ms. Johnson forthrightly testified that fear is a "constant" for Norco

residents. Johnson attributed that constant fear to the happenstance of the location of their

residences between Shell's refinery on one side and its chemical plant on the other, without

regard to any breach whatsoever in the handling of potentially harmful substances.

In *Castano,* the Fifth Circuit observed that under such circumstances involving a myriad

of individual factors, an action conducted nominally as a "class action" would "degenerate in

practice to multiple lawsuits separately tried."[79]  The predominance of individual-specific issues

relating to the plaintiffs' claims for compensatory damages would in turn detract from the

superiority of the class action device in resolving the plaintiffs' claims.[80]  In *Amchem Products,*

*Inc. v. Windsor,*[81] the Supreme Court instructed:

> In adding "predominance" and "superiority" to the qualification-for-certification
> list, the Advisory Committee sought to cover cases "in which a class action would
> achieve economies of time, effort, and expense, and promote ... uniformity of
> decision as to persons similarly situated, without sacrificing procedural fairness or
> bringing about other undesirable results." Sensitive to the competing tugs of
> individual autonomy for those who might prefer to go it alone or in a smaller unit,
> on the one hand, and systemic efficiency on the other, the Reporter for the 1966
> amendments cautioned: "The new provision invites a close look at the case before
> it is accepted as a class action...."[82]

---

[79]*Castano,* 84 F.3d at 745 n. 19 (citing Fed. R. Civ. P 23 (advisory committee notes)).

[80]See *id.* (explaining that the greater the number of individual issues, the less likely
superiority can be established).

[81]*Amchem,* 521 U.S. 591, 117 S.Ct. 2231 (1997).

[82]*Amchem,* 117 S.Ct. at 2246.

The Supreme Court further recognized that although the predominance test is readily met in certain cases involving consumer or securities fraud or violations of anti-trust law, even when arising from a common cause mass tort or mass accident, cases are likely to present *significant questions* affecting individuals in different ways:

> Even mass tort cases arising from a common cause or disaster may, depending on the circumstances, satisfy the predominance requirement. The Advisory Committee for the 1966 revisions of Rule 23 ... noted that "mass accident" cases are likely to present "significant questions, not only of damages but of liability and defenses to liability, ... affecting individuals different ways." And the Committee advised that such cases are "ordinarily not appropriate" for class treatment.[83]

In *Smith v. Texaco, Inc.*, the Fifth Circuit explained that the cause of action as a whole must satisfy Rule 23(b)(3)'s predominance requirement, before Rule 23(c)(4) becomes available to sever common issues for class trial.[84]  The predominance requirement cannot be met by repeatedly splitting off claims pursuant to subsection (c)(4).  The Fifth Circuit explained:

> To read the rule [23(c)(4)] ... as allowing a court to pare issues repeatedly until predominance is achieved, would obliterate Rule 23(b)(3)'s predominance requirement, resulting in automatic certification in every case in which any common issue exists, a result the drafters of the rule could not have intended.[85]

The instant case is not unlike that considered by the district court in *Mattoon v. City of Pittsfield.*[86]  That case similarly involved multiple defendants, and proximate causation presented a difficult issue. In the case at bar, the Parish and Orion may be liable under different theories for

---

[83]*Id.* at 2250 (citations omitted).  However, the *Amchem* Court did recognize that the text of Rule 23 does not categorically exclude mass tort cases from class certification and that the district courts have certified such mass tort cases in increasing numbers since the 1970's. *Id.*

[84]*Smith*, 263 F.3d 394, 409 (5th Cir. 2001).

[85]*Smith*, 263 F.3d at 409.

[86]128 F.R.D. 17 (D. Mass. 1989).

different courses of conduct. This is not a case where one set of operative facts establishes

liability. Proximate cause will necessarily be different for every person in the proposed class,

based on each individual class member's likely variances of exposure to contaminated drinking

water and/or diesel vapor, notice of the problem, pre-existing medical conditions, individual

sensitivities, and a whole host of other factors. For these reasons, liability cannot be determined

on class-wide basis in this case. Indeed, here as in *Mattoon,* proximate causation "remains a

thorny individual question," and the issue of damages presents individual considerations as

well.[87]

As to manageability, the lack of it is a foregone conclusion. A finding of fault on the part

of one or both of the class action defendants can only be likened to crossing a threshold, or

perhaps sticking the proverbial foot in the door. Thereafter, it is a virtual certainty that the

proposed class action will degenerate into a series of liability jury trials addressing the

predominate issues (*i.e.,* proof as to the requisite findings under Louisiana law as to individual

class members including proximate causation, injury-in-fact, and damages). Plaintiffs provide

---

[87]See *Mattoon,* 128 F.R.D. at 21; see also *Kemp v. Metabolife International Inc.*, 2002 WL 113894, at p. 3 (E. D. La.)(Berrigan, Chief J.)(involving an over-the-counter diet aid containing a combination of ingredients, noting (1) that some illnesses may well be caused by factors other than consumption of the product, and then to varying degrees citing *Kampen v. American Isuzu Motors*, 157 F.3d 306, 315-316 (5th Cir. 1998), and (2) "that the cause of action, as a whole, must satisfy rule 23(b)(3)'s predominance requirement....," and only then is rule 23(c)(4) available to sever the common issues for a class trial, quoting *Smith v. Texaco, Inc.*, 263 F.3d 394, 409 (5th Cir. 2001)); and *Neely v. Ethicon, Inc.*, 2001 WL 1090204, at p. 11 (E. D. Tex. 2001)(observing that any fault on the part of defendant is immaterial if an individual class member is unable to prove that the defendant's conduct caused the injury in fact and concluding that individual issues of causation and comparative fault will predominate over the proposed common issues regarding product defect).

this Court with no reasonable basis to assume that common issues of fault of either the Parish, Orion, or both, resolved *via* class verdict would not be revisited in the context of sure-to-follow individual trials as to liability.

Assuming *arguendo* that certification would grace the individual trials with some measure of judicial efficiency not otherwise realized,  the problems of proof unique to each class member's case predicate to a finding of liability under Louisiana law will likely consume more judicial resources than certification will save, particularly considering the commonplace symptomotology allegedly experienced together, with the plethora of individual-specific factors which figure into the determination of causation and damages B *i.e.*, the "significant" part of each case.   Defendants' conduct, while common, is but a minor part of each potential class member's case.[88] Suffice it to say, under the circumstances presented, the net result is more likely a waste of judicial resources.[89]   Ultimately, the battle royale in this case will be fought over causation on an individual basis.

---

[88]See *In re Agent Orange Prod. Liability Litigation MDL NO.  381,* 818 F.2d 145, 165-66 (2nd Cir. 1987), *cert. denied, sub nom., Pinkney v. Dow Chemical Co.,* 484 U.S. 1004, 108 S.Ct. 695 (1988); and *Commonwealth v. Puerto Rico v. M/V Emily S.,* 158 F.R.D. 9, 15, 1995 A.M.C. 1025 (D. Puerto Rico 1994)("Even if the plaintiffs succeeded in establishing fault or negligence on the part of one or more of the defendants, the personal injury claimants would still have the bulk of their cases to prove, because any successful personal injury claimant will still have to prove injury in fact and causation.

[89]See *Castano,* 84 F.3d at 749, n. 27 (citing *Sterling v. Velsicol Chemical Corp.*, 885 F.2d 1188, 1196 (6th Cir. 1988)(the Rule 23(b)(3) device "was designed not solely as a means for assuring legal assistance in the vindication of small claims but, rather, to achieve the economies of time, effort and expense.").

Accordingly and for all of the foregoing reasons,

**IT IS ORDERED** that the plaintiffs' Motions for Class Certification are DENIED.

New Orleans, Louisiana, this 28th day of May, 2002.

UNITED STATES DISTRICT JUDGE